Thomas L. Brown, Esq. (031017)
**ERNST, BROWN & DRAPER, PLLC**
1930 S. Alma School Road, SuiteA200
Mesa, AZ 85210
Telephone: (602) 324-9673
Email: TBrown@ebdlawyers.com
*Attorneys for the Plaintiff*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anna Castaneda, | Case No.:  2:26-cv-01124-MTL |
| Plaintiff, | |
| vs. | **FIRST AMENDED COMPLAINT** |
| | (Jury Trial Requested) |
| Debra's Way Productions, L.L.C.; Salvatore Gravano, also known as Sammy the Bull Gravano; Debra Scibetta, also known as Debra Gravano; and Gerard Gravano, | |
| Defendants. | |

Plaintiff Anna Castaneda, by and through undersigned counsel, for her First Amended Complaint against the above Defendants, hereby alleges as follows:

### NATURE OF THE CASE

1.     Plaintiff brings this action against Defendant Salvatore Gravano for assault and battery, against Defendants Salvatore Gravano and Gerard Gravano for defamation, against all Defendants for intentional infliction of emotional distress, and against Defendants Debra's Way, Salvatore Gravano, and Debra Gravano for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), violations of Arizona Minimum Wage, A.R.S. §§ 23-362, *et seq.* ("AMW"), violations of the Arizona Wage Act, A.R.S. §§ 23-350, *et seq.* ("AWA"), violations of Arizona Earned Paid Sick Time, A.R.S. §§ 23-371, *et seq.* ("EPST"), and violations of the Arizona Employment Protection Act, A.R.S. § 23-1501 ("AEPA").

1

## PARTIES, VENUE, AND JURISDICTION

2.      Plaintiff Anna Castaneda is an individual who, for all relevant times material to this dispute, has been a resident of Maricopa County, Arizona.

3.      Defendant Debra's Way Productions, L.L.C. ("Debra's Way) is an Arizona limited liability company registered to do business in Maricopa County, Arizona, which regularly transacts business in, and has significant and continuous contact with, this District. The registered statutory agent for Debra's Way is Neal G. Horenstein at 3130 N. Third Ave. Ste. 300, Phoenix, AZ 85013.

4.      Defendant Salvatore Gravano, also known as "Sammy the Bull" Gravano, is an individual who, for all relevant times material to this dispute, has been a resident of Maricopa County, Arizona.

5.      Defendant Debra Scibetta, also known as Debra Gravano, is an individual who, for all relevant times material to this dispute, has been a resident of Maricopa County, Arizona.

6.      According to information available on the Arizona Corporation Commission website, Debra Gravano is the member-manager of Defendant Debra's Way.

7.      Defendant Gerard Gravano is an individual who, for all relevant times material to this dispute, has been a resident of Maricopa County, Arizona.

8.      This Court has subject matter jurisdiction over Ms. Castaneda's claims pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 216(b) and 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Defendants because they are physically present, conduct business or committed one or more of the acts or omissions during the relevant timeframe within the District as alleged herein.

10.     Venue is proper in this District under 28 U.S.C §1391(b) and (c) because all or a substantial part of the acts or omissions giving rise to the claims occurred in Maricopa County, Arizona.

## GENERAL ALLEGATIONS

11.    Salvatore Gravano, also known as "Sammy the Bull," is a former underboss and member of the Gambino crime family of New York City who pled guilty to 19 murders committed from 1970 through 1990.

12.    Salvatore Gravano was married to Debra Gravano in 1971. They divorced in 1991.

13.    After his release from prison in 1994, Salvatore Gravano relocated to Arizona, where he was again arrested on federal and state drug trafficking charges in which his ex-wife, Debra Gravano, and their children, Gerard Gravano and Karen Gravano, were also implicated.

14.    Salvatore Gravano pled guilty and served approximately 16 years in prison before being released on lifetime supervised release in 2017.

15.    Salvatore Gravano is employed as the Chief Operating Officer by Debra's Way and, with the knowledge and approval of Debra's Way, holds himself out to be the "boss" and direct supervisor of all Debra's Way employees.

16.    Salvatore Gravano and his ex-wife, Debra's Way Chief Executive Officer Debra Gravano, work closely together and, upon information and belief, maintain control, oversight, and direction over the operations and employment practices of Debra's Way, as all as the control, oversight and direction of Debra's Way, and were acting directly or indirectly in the interests of Debra's Way in relation to Ms. Castaneda.

17.    Salvatore Gravano and Debra Gravano had the power to hire, fire, and discipline employees of Debra's Way, and had the authority to set and modify compensation rates for employees, including Plaintiff.

18.    Salvatore and Debra Gravano's son, Gerard Gravano, is employed by Debra's Way and, with the knowledge and approval of Debra's Way, holds himself out to be a manager of Debra's Way employees.

19.    At all relevant times, Defendant Debra's Way was the alter ego of

3

Defendants Salvatore Gravano and Debra Gravano in that there was a unity of control between them such that no separation between the entity and the individuals existed, rendering the observance of the corporate form an injustice.

20. At all relevant times, Debra's Way has failed to adhere to the usual corporate formalities in one or more of the following ways:

    a. Defendant Debra Gravano is the sole member-manager of Defendant Debra's Way as listed on the Arizona Corporation Commission ("ACC") website and, together with Defendant Salvatore Gravano, controls all the operations of Debra's Way;

    b. Apart from its Articles of Organization, Defendant Debra's Way has failed to make any other corporate filings with the ACC since its incorporation nearly eight years ago;

    c. Defendant Debra's Way has never issued any member certificates;

    d. Upon information and belief, Defendant Debra's Way does not maintain any corporate minutes, resolutions, operating agreements, employment agreements, or independent contractor agreements; and

    e. Upon information and belief, Defendant Salvatore Gravano works closely with Defendant Debra Gravano in controlling all operations of Debra's Way, yet Defendant Salvatore Gravano is neither a member nor an officer of Debra's Way.

21. Ms. Castaneda is a conservatory-trained entertainment industry professional who began working part-time with Debra's Way on or about July 18, 2022, after receiving a job offer from Gerard Gravano.

22. At all relevant times, Ms. Castaneda was an "employee" of Defendant Debra's Way within the meaning of 29 U.S.C. § 203(e), A.R.S. § 23-362(A), A.R.S. § 23-350(2), and A.R.S. 23-371(F).

23. At all relevant times, Ms. Castaneda was an "employee" of Defendant Debra

Gravano within the meaning of 29 U.S.C. § 203(e), A.R.S. § 23-362(A), and A.R.S. 23-371(F).

24.    At all relevant times, Ms. Castaneda was an "employee" of Defendant Debra's Way and its alter egos, Salvatore and Debra Gravano, within the meaning of 29 U.S.C. § 203(e), A.R.S. § 23-362(A), A.R.S. § 23-350(2), and A.R.S. 23-371(F).

25.    At all relevant times, Defendant Debra's Way was an "employer" of Ms. Castaneda within the meaning of 29 U.S.C. § 203(d), A.R.S. § 23-362(B), A.R.S. § 23-350(3), and A.R.S. 23-371(G).

26.    At all relevant times, Defendant Debra Gravano was an "employer" of Ms. Castaneda within the meaning of 29 U.S.C. § 203(d), A.R.S. § 23-362(B), and A.R.S. 23-371(G).

27.    At all relevant times, Defendant Debra's Way and its alter egos, Salvatore and Debra Gravano, were each an "employer" of Ms. Castaneda within the meaning of 29 U.S.C. § 203(d), A.R.S. § 23-362(B), A.R.S. § 23-350(3), and A.R.S. 23-371(G).

28.    Upon information and belief, Debra's Way has more than five hundred thousand dollars in gross annual revenue and is not exempt from having to pay federal minimum wages, meaning it is not a "small business" pursuant to A.R.S. § 23-362(C).

29.    At the time of Ms. Castaneda's hiring, her job duties included, *inter alia*, in-house administrative work and executive assistant duties for Salvatore Gravano.

30.    Over time, Ms. Castaneda began working as a Producer for Debra's Way.

31.    Almost immediately after Ms. Castaneda began her employment, Salvatore Gravano began subjecting her to a hostile work environment on the basis of her race and gender, making both racially derogatory comments to her as well as subjecting her to sexually explicit and harassing comments and behaviors.

32.    Throughout much of Ms. Castaneda's employment, Salvatore Gravano openly displayed a firearm in his office during working hours, and, upon information and belief, pointed it at someone's head on at least one occasion in front of another employee,

leading Ms. Castaneda to fear for her safety throughout the course of her employment.

33.    Upon information and belief, possession of a firearm is a violation of the terms of Salvatore Gravano's lifetime supervised release.

34.    Early in Ms. Castaneda's employment, Salvatore Gravano informed her of his desire to produce a movie or scripted television series regarding his life story.

35.    Due to Ms. Castaneda's background in the entertainment industry, she was able to secure meetings on Salvatore Gravano's behalf with major studios, executive producers, show creators, and writers.

36.    At the time of Ms. Castaneda's hiring in July 2022, Debra's Way agreed to pay her $560.00 per week for 20 hours of work, which amounted to a rate of $28.00 per hour.

37.    On or about August 8, 2022, due to her early success in leveraging connections for Salvatore Gravano in the entertainment industry, as well as her professionalism and work ethic, Ms. Castaneda was given a raise to $600.00 per week for 20 hours of work, which amounted to a rate of $30.00 per hour.

38.    Beginning in or around September 2022, numerous employees of Debra's Way resigned due to the hostile work environment perpetuated by Salvatore Gravano.

39.    During this time period, Ms. Castaneda witnessed Mr. Gravano have multiple violent outbursts toward female employees, causing Ms. Castaneda further fear for her safety.

40.    As a result of the resignations, Ms. Castaneda's work hours and responsibilities dramatically increased from the agreed-upon 20 hours per week to an average of approximately 45 hours per week, and she was required to be "on-call" at all times, 24 hours per day and 7 days per week, if Salvatore Gravano contacted her for any work duties.

41.    Ms. Castaneda continued averaging approximately 45 hours per week throughout the remainder of her employment and was required to be "on-call" at all times

6

and travel with Mr. Gravano as necessary.

42.     Despite the earlier agreement that Ms. Castaneda would work 20 hours per week, Debra's Way failed to pay her any additional amounts for the extra 15 hours per week she began working in September 2022.

43.     On or about November 7, 2022, due to her proven success at leveraging connections for Salvatore Gravano in the entertainment industry, as well as her professionalism and work ethic, Ms. Castaneda was given a raise and her weekly rate increased to $640.00, or $32.00 per hour.

44.     On or about December 26, 2022, Ms. Castaneda was asked to increase her required weekly hours from 20 to 30 hours per week, despite the fact that she was already working more than 30 hours per week on a regular basis. At this time, her weekly pay rate was increased to $750.00 per week for 30 hours of work, amounting to an hourly rate of $25.00.

45.     In or about September 2023, Ms. Castaneda accompanied Salvatore Gravano to a business dinner meeting with an executive producer.

46.     After the dinner, Ms. Castaneda returned to the Debra's Way office with Mr. Gravano to wait for an Uber to bring her home.

47.     While Ms. Castaneda was sitting in a chair in the office, Mr. Gravano stood over her, forcibly kissed her and thrust his tongue into her mouth without consent.

48.     Ms. Castaneda recoiled and pushed Mr. Gravano away.

49.     On or about November 20, 2023, due to her continued success at leveraging connections for Salvatore Gravano in the entertainment industry, as well as her professionalism and work ethic, Ms. Castaneda was given a raise and her weekly rate increased to $850.00, or $28.33 per hour.

50.     In or about December 2023, Ms. Castaneda travelled with Salvatore Gravano to Los Angeles, California, for business meetings.

51.     Salvatore Gravano insisted that he and Ms. Castaneda share a hotel room

7

overnight, rather than booking separate rooms, in order to save money.

52.     Ms. Castaneda objected and offered to pay for her own room, but Mr. Gravano insisted that they share a room with only one bed, as they were not going to sleep very long given their early-morning return flight.

53.     Despite Ms. Castaneda's discomfort, she begrudgingly agreed to sleep in the single bed, and proceeded to lie on the edge of the bed, over the comforter, in an effort to avoid physical contact with Mr. Gravano.

54.     During the night, Mr. Gravano began rubbing Ms. Castaneda's arm without her consent while lying in bed, which made Ms. Castaneda extremely uncomfortable as she did not wish to engage in any physical contact with Mr. Gravano.

55.     Ms. Castaneda turned further away and pretended to be asleep in order to disengage from Mr. Gravano's advances.

56.     On or about February 20, 2024, Ms. Castaneda and Salvatore Gravano again travelled together to Los Angeles, California, for meetings related to the scripted television project Ms. Castaneda was helping Mr. Gravano pitch.

57.     Salvatore Gravano again insisted that he and Ms. Castaneda share a hotel room overnight, rather than booking separate rooms, in order to save money.

58.     Ms. Castaneda again objected and offered to pay for her own room, but Mr. Gravano insisted that they share a room, this time with separate beds.

59.     In their hotel room, Mr. Gravano sat on Ms. Castaneda's bed uninvited and offered her a massage, ostensibly to help with migraine symptoms she was experiencing.

60.     Ms. Castaneda declined Mr. Gravano's offer several times and explained that she did not want to be touched.

61.     Mr. Gravano ignored Ms. Castaneda's objections and proceeded to touch and massage her head, shoulders, and neck without consent.

62.     Although Ms. Castaneda's continued objecting and asking Mr. Gravano to stop, Mr. Gravano continued touching her without her consent.

63.     Plaintiff was extremely upset and uncomfortable during this interaction, and vomited after Mr. Gravano finally ended the forced massage and left the room.

64.     On or about March 19, 2024, Salvatore Gravano held a dinner celebrating his birthday.

65.     Ms. Castaneda was required to accompany Mr. Gravano in his car to and from the dinner.

66.     After the dinner, Ms. Castaneda drove Mr. Gravano back to his home and accompanied him inside to his home office, as he indicated that he had business matters to discuss with her.

67.     Ms. Castaneda proceeded to sit in a chair in Mr. Gravano's home office.

68.     Mr. Gravano stood over Ms. Castaneda and forcibly kissed her and thrust his tongue into her mouth without consent.

69.     Ms. Castaneda recoiled and pushed Mr. Gravano away.

70.     Salvatore Gravano engaged in other sexually inappropriate behavior in the workplace during this time period, oftentimes in front of other industry and media professionals, including displaying nude photos of women on his phone to Ms. Castaneda during working hours, and fondling his penis over his clothing and exclaiming to Ms. Castaneda and another female staff member, "Look how hard my dick is!"

71.     Mr. Gravano reacted with anger when female employees rejected his sexual advances or objected to his sexually explicit comments, which caused Ms. Castaneda to further fear for her safety and well-being in her interactions with him.

72.     In April 2024, Salvatore Gravano was experiencing bowel issues and required Ms. Castaneda, during work hours, to assist him with a stool test by scooping his feces and transferring it into test tubes.

73.     This incident caused Ms. Castaneda severe emotional distress, as she is an educated professional in the entertainment industry and felt humiliated to be required to handle her boss's fecal matter.

9

74. Due to ongoing and increasingly hostile disagreements regarding the contract for a scripted television series they were working on, as well as the hostile and inappropriate behavior detailed above, Ms. Castaneda sent an email to Salvatore Gravano on April 22, 2024, outlining her concerns, *inter alia*, regarding his treatment of her and her misclassification as an independent contractor.

75. On or about May 2, 2024, Ms. Castaneda's weekly rate decreased to $680.00 for a required 24 hours per week, or $28.33 per hour, in retaliation for her complaints. In addition, for approximately 5 weeks during April and May 2024, Ms. Castaneda received little or no pay for her hours worked, in retaliation for her complaints.

76. Despite this retaliation, Ms. Castaneda continued to raise complaints to Salvatore Gravano throughout the remainder of her employment regarding her concerns that she was misclassified as an independent contractor and that this misclassification resulted in a perceived loss of employment benefits and protections.

77. On or about June 27, 2024, during a business trip to Los Angeles, Salvatore Gravano became enraged over a Hollywood director who was not returning Mr. Gravano's emails about the scripted show project.

78. While in a car with Ms. Castaneda and another executive producer, Mr. Gravano began making racist slurs and violent remarks about this director, who happened to be African American.

79. Later that evening, Mr. Gravano had to be physically restrained by multiple people after attempting to physically assault, and throw an ashtray and a glass at, a podcaster at a cigar lounge in Beverly Hills.

80. These incidents further contributed to Ms. Castaneda's reasonable belief that Salvatore Gravano posed a danger to her physical safety if she did not do exactly what he asked of her at all times.

81. On or about August 22, 2024, Ms. Castaneda witnessed a violent altercation between Salvatore Gravano and his son, Gerard Gravano, in which Gerard referenced

Salvatore's involvement in the murder of Gerard's uncle, Nicholas Scibetta.

82.     Salvatore Gravano became enraged during this conversation and proceeded to strangle his own son in front of Ms. Castaneda, causing Ms. Castaneda increased fear for her own physical safety from that point forward.

83.     On or about January 18, 2025, Ms. Castaneda was informed that Salvatore Gravano got into a confrontation with a woman at a bar in Scottsdale, Arizona, and that Mr. Gravano physically assaulted this woman in public.

84.     Hearing about this incident further contributed to Ms. Castaneda's fear for her personal safety during her interactions with Mr. Gravano.

85.     On or about February 17, 2025, Ms. Castaneda informed Salvatore Gravano and Debra's Way that she needed to work from home for a period of time due to a medical crisis involving her son.

86.     During this time period, Ms. Castaneda continued to successfully perform all required job duties.

87.     Debra's Way failed to pay Ms. Castaneda for her time worked after February 14, 2025, resulting in additional unpaid wages.

88.     However, Salvatore Gravano became increasingly agitated and unstable as a result of Ms. Castaneda's physical absence, alternating between extreme anger and using expletives at Ms. Castaneda in phone calls and text messages, to sexually propositioning her and asking her to meet him for a candlelit dinner and let him "fuck" her.

89.     On February 25, 2025, Salvatore Gravano texted Ms. Castaneda to inform her that she was "fired" due to her physical absence resulting from her need to care for her son during his medical crisis.

90.     During that same text exchange, Mr. Gravano stated that he would "crush" Ms. Castaneda if she came forward with allegations against him.

91.     During another text exchange on March 3, 2025, Mr. Gravano also acknowledged that Ms. Castaneda was an "employee" all along.

11

92.    Despite Mr. Gravano's statement that Ms. Castaneda was "fired," Ms. Castaneda, with Mr. Gravano's knowledge and approval, continued performing work for Debra's Way until March 5, 2025.

93.    In or about March or April 2025, Defendants Salvatore Gravano and Gerard Gravano intentionally or negligently made false oral statements to at least three other employees of Debra's Way, that Plaintiff is a "hooker," and that she "extorts men for money."

94.    Upon information and belief, at least one of those employees then further disseminated these defamatory statements to additional entertainment industry professionals outside of Debra's Way.

95.    On or about June 26, 2025, Salvatore Gravano stated to another Debra's Way employee that he wanted to "shoot" Ms. Castaneda and that nothing would stop him from making his television series.

96.    On or about July 7, 2025, Salvatore Gravano made comments to another Debra's Way employee that he became sexually aroused by the idea of strangling Ms. Castaneda to death.

97.    On or about July 27, 2025, Salvatore Gravano called and sent a text message to Ms. Castaneda asking her to meet with him in an attempt to lure her back with a promise of resuming work on his scripted show.

98.    On or about August 19, 2025, Ms. Castaneda filed a police report against Salvatore Gravano regarding death threats, sexual assault, and firearm possession.

99.    On or about September 12, 2025, Salvatore Gravano approached Ms. Castaneda's family member and stated he was surprised Ms. Castaneda was "coming after" him and that he thought she would be more concerned about the safety of herself and her son, implying that Ms. Castaneda and her son could be in danger if she pursues legal action against him.

100.    In December 2025, after learning of Ms. Castaneda's police report against

him, Salvatore Gravano filmed a YouTube Live video in which he stated that he wished he and former mafia affiliate John Gotti, Sr. were "on the streets" because he would "blow [his] fucking head off." Immediately after making that threatening comment, Mr. Gravano suddenly segued into discussing Ms. Castaneda's claims. This complete non sequitur appeared to be an attempt at veiled threats against Ms. Castaneda for coming forward.

101.    Debra's Way exercised substantial control over Ms. Castaneda's work at all relevant times, including but not limited to:

   a.  Unilaterally setting Ms. Castaneda's rate of pay;

   b.  Controlling Ms. Castaneda's working hours;

   c.  Requiring Ms. Castaneda to accept all work assignments given to her;

   d.  Requiring Ms. Castaneda to perform the majority of her work in-person;

   e.  Limiting Ms. Castaneda's ability to work for others;

   f.  Engaging in a continuous employment relationship with Ms. Castaneda over the course of nearly three years; and

   g.  Requiring Ms. Castaneda to perform tasks that were central to the core business of Debra's Way.

102.    Despite the above, Debra's Way paid Ms. Castaneda as a 1099 independent contractor during the course of her employment.

103.    During the course of her employment, Ms. Castaneda received a flat fee based on her weekly salary, with no pay for the additional 15 hours in regular time or overtime that she was routinely working in addition to the agreed-upon 30 hours per week.

104.    Ms. Castaneda was paid the following amounts for her work at Debra's Way over the following time periods:

   a.  For the period of February 17, 2023 through November 17, 2023, Ms. Castaneda was paid $750.00 per week, amounting to a total of $30,000.00.

   b.  For the period of November 18, 2023 through April 12, 2024, Ms. Castaneda was paid $850.00 per week, amounting to a total of $17,850.00.

c.  For the period of April 13, 2024 through May 23, 2024, Ms. Castaneda was paid a total of $1,028.00.

d.  For the period of May 24, 2024 through February 14, 2025, Ms. Castaneda was typically paid $680.00 per week (although she was paid lesser amounts for at least 4 weeks during this timeframe) and received a total of $25,170.00.

105.    However, Ms. Castaneda is entitled to the following amounts in overtime pay at a rate of 1.5 times regular hourly rates for the 5 hours of overtime she worked, on average, in any given workweek:

a.  For the period of February 17, 2023 through November 17, 2023, Ms. Castaneda is entitled to $187.50 in overtime pay per week, amounting to a total of $7,500.00.

b.  For the period of November 18, 2023 through February 28, 2025, Ms. Castaneda is entitled to $212.50 in overtime pay per week, amounting to a total of $14,237.50.

106.    In addition, Ms. Castaneda failed to receive any compensation, including federal or state minimum wages, for pay periods ending on April 26, 2024, May 3, 2024, May 17, 2024, November 29, 2024, February 21, 2025, February 28, 2025, and March 5, 2025.

107.    Effective January 1, 2024, Arizona minimum wage was $14.35 per hour. Arizona minimum wage increased to $14.70 per hour effective January 1, 2025.

108.    For each week during the time period of May 24, 2024 through February 14, 2025, Ms. Castaneda was not paid all minimum wage owed to her under Arizona law.

109.    For the time period of May 24, 2024 through February 14, 2025, Ms. Castaneda was typically paid $680.00 per week for 45 hours of work, amounting to an hourly rate of approximately $14.31 per hour after accounting for federally mandated overtime pay, which is less than the overtime rates required in Arizona in 2024 and 2025.

110.    For the time period February 15, 2025 through March 5, 2025, Ms. Castaneda

14

was not paid any wages, including Arizona minimum wages, for her time worked.

## CLAIM ONE

### (Against Defendant Salvatore Gravano)

### Assault and Battery

111.    Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

112.    On or about February 20, 2024 and again on or about March 19, 2024, as described above in paragraphs 56 through 69, Defendant Salvatore Gravano intentionally caused harmful contact with Plaintiff to occur.

113.    Defendant Salvatore Gravano's touching of Plaintiff was not authorized and was done without Plaintiff's consent.

114.    Defendant Salvatore Gravano's touching of Plaintiff was harmful and offensive as it was done after Plaintiff's express communication that such touching was unwanted.

115.    Defendant Salvatore Gravano's actions offended Plaintiff's reasonable sense of personal dignity.

116.    As a result of Defendant Salvatore Gravano's actions as described herein, Plaintiff has suffered damages including, but not limited to, emotional distress, mental anguish, disgust, shame, and humiliation.

117.    Defendant Salvatore Gravano is liable to Plaintiff for all damages resulting from his unlawful acts described herein.

## CLAIM TWO

### (Against Defendants Salvatore Gravano and Gerard Gravano)

### Defamation

118.    Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

119.    In or about March or April 2025, Defendants Salvatore Gravano and

15

Gerard Gravano intentionally or negligently made a false oral statement to at least three other employees of Debra's Way, that Plaintiff is a "hooker," and that she "extorts men for money."

120. Upon information and belief, at least one of those employees then further disseminated these defamatory statements to additional entertainment industry professionals outside of Debra's Way.

121. Damages are presumed because this statement was defamation per se in that it impeached the honesty, integrity or reputation of Plaintiff and related to sexual misconduct or chastity.

122. As a result of Defendants Salvatore Gravano and Gerard Gravano's actions as described herein, Plaintiff has suffered damages including, but not limited to, reputational harm, emotional distress, mental anguish, shame, and humiliation.

123. Defendants Salvatore Gravano and Gerard Gravano are jointly and severally liable to Plaintiff for all damages resulting from their unlawful acts described herein.

## CLAIM THREE

### (Against All Defendants)

### Intentional Infliction of Emotional Distress

124. Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

125. Defendants' actions, including but not limited to the conduct described above in paragraphs 31-32, 56-74, 77-84, 88-90, 93-97, and 99-100, were extreme and outrageous.

126. Due, in part, to Salvatore Gravano's actions and background, including but not limited to the allegations set forth in paragraphs 11, 13-14, 31-33, 38-39, 45-48, 50-74, 77-84, 88-90, 93-97, and 99-100, Plaintiff was reasonably in fear for her physical safety during the interactions with Mr. Gravano described in paragraphs 31-32, 56-74,

77-84, 88-90, 93-97, and 99-100.

127.    During their actions as described in paragraphs 31-32, 56-74, 77-84, 88-90, 93-97, and 99-100, Defendants either intended to cause emotional distress to Plaintiff or recklessly disregarded the near certainty that Plaintiff would suffer emotional distress as a result of their actions.

128.    As a result of Defendants' actions as described in paragraphs 31-32, 56-74, 77-84, 88-90, 93-97, and 99-100, Plaintiff has suffered damages including, but not limited to, severe emotional distress, mental anguish, anxiety, shame, and humiliation.

129.    Defendant Debra's Way is the alter ego of Defendants Debra and Salvatore Gravano. Alternatively, due to the failure of Debra's Way to adhere to corporate formalities as alleged, there is sufficient factual and legal basis to pierce the corporate veil of Defendant Debra's Way so as to hold Defendants Debra and Salvatore Gravano vicariously liable for all amounts due Plaintiff as alleged.

130.    Defendants are jointly and severally liable to Plaintiff for all damages resulting from their unlawful acts described in paragraphs 31-32, 56-74, 77-84, 88-90, 93-97, and 99-100.

## CLAIM FOUR

**(Against Defendants Debra's Way, Salvatore Gravano, and Debra Gravano)**

**Violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.***

131.    Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

132.    Plaintiff performed employment services as a non-exempt employee for Defendants Debra's Way, Salvatore Gravano, and Debra Gravano.

133.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano were required to compensate Plaintiff at a rate of at least minimum wage for all hours worked, and a rate of at least 1.5 times regular pay for all hours worked in excess of 40 per week.

134.    During Plaintiff's employment, she was consistently and regularly required

to work more than the agreed-upon hours per week.

135.    During Plaintiff's employment, she was consistently and regularly required or suffered and permitted to work more than 40 hours per week.

136.    As described above, Defendants Debra's Way, Salvatore Gravano, and Debra Gravano have not made a good-faith effort to comply with the requirements of the FLSA.

137.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano have willfully failed to pay Plaintiff any wages, including federal minimum wages of $7.25 per hour, for time worked during pay periods ending in April 26, 2024, May 3, 2024, May 17, 2024, November 29, 2024, February 21, 2025, February 28, 2025, and March 5, 2025, in violation of 29 U.S.C. § 206.

138.    Plaintiff is therefore owed at least $1,848.75 in federal minimum wages.

139.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano have willfully failed to pay Plaintiff overtime for the hours worked in excess of 40 per week in violation of 29 U.S.C. § 207.

140.    As described above, Plaintiff did not receive overtime pay in the amount of at least $21,737.50 for the time period of February 17, 2023 through February 28, 2025.

141.    Defendant Debra's Way is the alter ego of Defendants Debra and Salvatore Gravano. Alternatively, due to the failure of Debra's Way to adhere to corporate formalities as alleged, there is sufficient factual and legal basis to pierce the corporate veil of Defendant Debra's Way so as to hold Defendants Debra and Salvatore Gravano vicariously liable for all amounts due Plaintiff as alleged.

142.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are jointly and severally liable to Plaintiff for damages under 29 U.S.C. § 216(b), including but not limited to at least $23,586.25 in unpaid minimum wage and overtime, an additional equal amount of $23,586.25 as liquidated damages, and attorneys' fees and

18

costs.

## CLAIM FIVE

**(Against Defendants Debra's Way, Salvatore Gravano, and Debra Gravano)**

**Violations of Arizona Minimum Wage, A.R.S. §§ 23-362, *et seq.***

143.    Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

144.    Pursuant to A.R.S. § 23-363, Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are obligated to pay Plaintiff at least Arizona minimum wages for all hours worked.

145.    Effective January 1, 2024, Arizona minimum wage was $14.35 per hour. Arizona minimum wage increased to $14.70 per hour effective January 1, 2025.

146.    Ms. Castaneda failed to receive any compensation, including Arizona minimum wages, for pay periods ending on April 26, 2024, May 3, 2024, May 17, 2024, November 29, 2024, February 21, 2025, February 28, 2025, and March 5, 2025.

147.    Ms. Castaneda is therefore entitled to at least $4,343.50 in Arizona minimum wages for these weeks.

148.    For the time period of May 24, 2024 through February 14, 2025, Ms. Castaneda was typically paid $680.00 per week for 45 hours of work, amounting to an hourly rate of approximately $14.31 per hour after accounting for federally mandated overtime pay, which is less than the overtime rates required in Arizona in 2024 and 2025.

149.    For the time period February 15, 2025 through March 5, 2025, Ms. Castaneda was not paid any wages, including Arizona minimum wages, for her time worked.

150.    For each week during the time period of April 13, 2024 through March 5, 2025, Ms. Castaneda was not paid all minimum wage owed to her under Arizona law.

151.    Ms. Castaneda is therefore entitled to an additional $1,183.54 in minimum wages for this time period.

152.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano willfully

19

failed to pay Plaintiff Arizona minimum wages.

153.    Defendant Debra's Way is the alter ego of Defendants Debra and Salvatore Gravano. Alternatively, due to the failure of Debra's Way to adhere to corporate formalities as alleged, there is sufficient factual and legal basis to pierce the corporate veil of Defendant Debra's Way so as to hold Defendants Debra and Salvatore Gravano vicariously liable for all amounts due Plaintiff as alleged.

154.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are jointly and severally liable to Plaintiff for all resulting damages, including unpaid minimum wages of at least $5,527.04 and an additional amount double the unpaid minimum wages, and attorneys' fees and costs pursuant to A.R.S. § 23-364.

## CLAIM SIX

## (Against Defendants Debra's Way, Salvatore Gravano, and Debra Gravano)
## Violations of Arizona Wage Act, A.R.S. §§ 23-350, *et seq.*

155.    Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

156.    Pursuant to A.R.S. § 23-351, Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are obligated to pay Plaintiff the wages she is owed on regular paydays.

157.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano failed to pay Plaintiff for time worked after February 14, 2025, amounting to a loss of at least $3,116.67.

158.    Defendant Debra's Way is the alter ego of Defendants Debra and Salvatore Gravano. Alternatively, due to the failure of Debra's Way to adhere to corporate formalities as alleged, there is sufficient factual and legal basis to pierce the corporate veil of Defendant Debra's Way so as to hold Defendants Debra and Salvatore Gravano vicariously liable for all amounts due Plaintiff as alleged.

159.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are

jointly and severally liable to Plaintiff for all resulting damages, including unpaid wages and treble damages pursuant to A.R.S. § 23-355(A), and attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

## CLAIM SEVEN

### (Against Defendants Debra's Way, Salvatore Gravano, and Debra Gravano)

### Violations of Arizona Earned Paid Sick Time, A.R.S. §§ 23-371, *et seq.*

160. Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

161. Pursuant to A.R.S. § 23-371, et seq., Defendants Debra's Way, Salvatore Gravano, and Debra Gravano were required to provide Plaintiff with earned paid sick time benefits and notice of those benefits.

162. Defendants Debra's Way, Salvatore Gravano, and Debra Gravano failed to provide Plaintiff with earned paid sick time benefits or notice of those benefits and failed to keep relevant records of the paid sick time that should have accrued.

163. On or about February 17, 2025, Plaintiff attempted to use earned paid sick time to care for her son during a medical crisis.

164. Defendants Debra's Way, Salvatore Gravano, and Debra Gravano failed to pay Plaintiff her earned paid sick time and then retaliated against Plaintiff for exercising her right to earned paid sick time by terminating her employment in violation of A.R.S. 23-374.

165. Defendant Debra's Way is the alter ego of Defendants Debra and Salvatore Gravano. Alternatively, due to the failure of Debra's Way to adhere to corporate formalities as alleged, there is sufficient factual and legal basis to pierce the corporate veil of Defendant Debra's Way so as to hold Defendants Debra and Salvatore Gravano vicariously liable for all amounts due Plaintiff as alleged.

166. Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are jointly and severally liable to Plaintiff for all resulting damages, including payment of

earned paid sick time, an additional amount equal to twice the unpaid earned paid sick time, statutory penalties of not less than $150 per day from February 17, 2025 until the date of judgment, and attorneys' fees and costs pursuant to A.R.S. § 23-364.

## CLAIM EIGHT

### (Against Defendants Debra's Way, Salvatore Gravano, and Debra Gravano)

### Violations of the Arizona Employment Protection Act, A.R.S. § 23-1501

167.    Plaintiff reasserts each of the allegations set forth above as though fully set forth herein.

168.    A.R.S. § 23-1501(A)(3)(c) makes it unlawful for an employer to terminate an employee in retaliation for:

> The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

169.    Plaintiff had a reasonable belief that she was not being paid in accordance with Arizona law as outlined above.

170.    Plaintiff reported this belief on multiple occasions to Defendant Salvatore Gravano.

171.    As a result of and in retaliation for Plaintiff's report, *inter alia*, Defendants Debra's Way, Salvatore Gravano, and Debra Gravano unlawfully terminated Plaintiff's employment.

172.    The acts or omissions of Defendants Debra's Way, Salvatore Gravano, and Debra Gravano were willful and malicious such that punitive damages are warranted.

173.    Defendant Debra's Way is the alter ego of Defendants Debra and Salvatore

Gravano. Alternatively, due to the failure of Debra's Way to adhere to corporate formalities as alleged, there is sufficient factual and legal basis to pierce the corporate veil of Defendant Debra's Way so as to hold Defendants Debra and Salvatore Gravano vicariously liable for all damages caused to Plaintiff.

174.    Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are jointly and severally liable to Plaintiff for all resulting damages, including lost wages, front pay, emotional distress, attorneys' fees and costs pursuant to A.R.S. §§ 12-341 and 12-341.01.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment against the Defendants as follows:

A.    A Declaration that Defendant Debra's Way is the alter ego of Defendants Debra Gravano and Salvatore Gravano and that the corporate veil of Defendant Debra's Way has been pierced so as to make Defendants Debra and Salvatore Gravano jointly and severally liable or, in the alternative, to make Defendants Debra Gravano and Salvatore Gravano vicariously liable, for the acts and omissions of Defendant Debra's Way;

B.    A Declaration that Defendant Salvatore Gravano is liable to Plaintiff for assault and battery;

C.    A Declaration that Defendants Salvatore Gravano and Gerard Gravano are jointly and severally liable to Plaintiff for defamation;

D.    A Declaration that all Defendants are jointly and severally liable to Plaintiff for intentional infliction of emotional distress;

E.    A Declaration that Defendants Debra's Way, Salvatore Gravano, and Debra Gravano are jointly and severally liable to Plaintiff for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), violations of Arizona Minimum Wage, A.R.S. §§ 23-362, *et seq.*

("AMW"), violations of the Arizona Wage Act, A.R.S. §§ 23-350, *et seq.* ("AWA"), violations of Arizona Earned Paid Sick Time, A.R.S. §§ 23-371, *et seq.* ("EPST"), and violations of the Arizona Employment Protection Act, A.R.S. § 23-1501 ("AEPA");

F.  An award of damages and judgment in favor of Plaintiff and against Defendants for their unlawful acts and omissions as alleged herein including all economic, non-economic, compensatory and punitive damages to the fullest extent permitted by law;

G.  For pre-judgment and post-judgment interest at the maximum applicable statutory rate, as appropriate;

H.  For an award of attorney's fees and costs, as appropriate, under 29 U.S.C. § 216(b), A.R.S. §§ 12-341, 12-341.01, and 23-364;

I.  For an award of costs, expenses, and expert fees incurred and allowed under any theory, including, but not limited to, applicable federal and Arizona law and statutes; and

J.  For such other relief as this Court may deem just and appropriate.

**RESPECTFULLY SUBMITTED** this 27th day of May, 2026.

By: _____

Thomas L. Brown, Esq.
**ERNST, BROWN & DRAPER, PLLC**
1930 S. Alma School Road, Suite A200
Mesa, AZ 85210
*Attorneys for Plaintiff*

24